**UNITED STATES of America, Appellee,**

v.

**James C. PANAS, Appellant.**

**No. 83–1909.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1984.

Decided June 29, 1984.

Rehearing Denied Aug. 1, 1984.

Robert G. Ulrich, U.S. Atty., Michael A. Jones, Asst. U.S. Atty., Springfield, Mo., for appellee.

James Larson, Nina Wilder, Larson & Weinberg, San Francisco, Cal., for appellant James Christopher Panas.

Before ARNOLD, JOHN R. GIBSON and BOWMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

James C. Panas was convicted of conspiracy to distribute, and possession with intent to distribute, lysergic acid diethylamide (LSD) in violation of 21 U.S.C. §§ 846 and 841(a) (1982). On appeal, he raises numerous allegations of error. The most significant among these are the admission of testimony under the coconspirator exception to the hearsay rule, the government's alleged withholding of evidence from discovery, and the district court's [1] granting of a Protective Order foreclosing discovery of technical data of the transmitter used by undercover agents in his arrest. We have carefully reviewed all of Panas' arguments and affirm his conviction.

In late 1982, government informant Michael Vanderhoof contacted Dennis Rhine, a drug dealing associate that Vanderhoof had known since 1974. Vanderhoof purchased a small amount of LSD from Rhine on a number of occasions as a foundation for a larger transaction designed to reveal Rhine's source. In this larger transaction, Vanderhoof was to act as a middleman between Rhine and John J. Bickers, a Missouri State Highway Patrol Trooper conducting undercover drug investigations.

This larger transaction was arranged through four phone conversations between October 26 and November 2, 1982. The first occurred on October 26. Vanderhoof testified that he called Rhine on that date, that the two discussed plans for the transaction, and that Rhine requested expense money in advance for him and "his friends." This conversation was taped and played for the jury. The second call was between Bickers and Rhine on October 28. Bickers testified that, during the call, the two agreed on price ($3500.00 per gram), amount (twelve grams), and date (November 3) of the LSD delivery. During this conversation, Rhine indicated that "a friend or a partner" would be accompanying him on the trip to Missouri. A tape of this

conversation proved to be inaudible and was not offered as evidence. The third call was between Vanderhoof and Rhine on October 31. Vanderhoof testified that during this conversation Rhine referred to his friend as "Jimmy" and that "he was driving a Mercedes and they were out 'turbo-ing' around."[2] This conversation was taped and played for the jury. The fourth and final call was between Vanderhoof and Rhine on November 2. Vanderhoof testified that Rhine stated that everything was ready for the November 3 delivery.

In preparation for the transaction, Bickers and Vanderhoof rented a hotel room near the airport. Bickers intended to wear a "Kel" receiving and recording device during the meeting, but the recording apparatus had been misplaced. He thus borrowed a "T-4" transmitting device from the Kansas City FBI office for the meeting. This enabled DEA Agent Casteel and FBI Agent Triplett to monitor the conversation from an adjoining room, and also allowed FBI Photographer Johnson, stationed in the hotel parking lot, to make an unauthorized recording of the conversation through reception of the T-4 transmission on his car radio.

Rhine and Panas were seen arriving together at the Kansas City Airport on November 3. They proceeded to the hotel room and met and spoke with Bickers and Vanderhoof for approximately twenty minutes. Panas spoke in depth with Vanderhoof and Bickers about the sale and marketing of LSD. After seeing that Bickers had the $42,000 purchase price, Panas left the room and returned with a small bottle later identified as containing approximately 11.7 grams of LSD. Upon a prearranged signal, Casteel and Triplett entered the room and arrested Rhine and Panas.

Prior to Panas' trial, Rhine plead guilty to both counts in the indictment and to three additional related charges. Panas

1. The Honorable William R. Collinson, Senior United States District Judge for the Western District of Missouri.

2. Appellant's first name is James and testimony revealed that a Mercedes automobile was registered in his name in California.

was convicted and sentenced to consecutive five-year terms.

## I.

Panas first asserts the district court erred in admitting into evidence statements made by Rhine during the telephone conversations with Vanderhoof and Bickers. He claims that these statements are not admissible under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), because there was no evidence independent of the hearsay statements themselves that Panas was illegally associated with Rhine as of October 26.

We recently outlined the standards under which hearsay statements are admissible against a coconspirator:

> An out-of-court declaration of a coconspirator is admissible against a defendant if (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the declaration was made during the course and in furtherance of the conspiracy. Where the defendant asserts that no conspiracy existed at the time the challenged statements were made, the government must show by a "preponderance of independent evidence" that a conspiracy existed. This standard provides that a coconspirator's statements are admissible "if on the independent evidence the district court is satisfied that it is more likely than not that the statement was made during the course ... of an illegal association to which the declarant and the defendant were parties." While the evidence must be independent, *i.e.*, exclusive of the challenged statements, it may be circumstantial[.] The district court's determination will not be reversed unless clearly erroneous.

*United States v. Singer*, 732 F.2d 631, 635–36 (8th Cir.1984) (citations omitted).

■ The critical question is whether there is independent evidence making it more likely than not that a conspiracy existed between Panas and Rhine as of October 26. The evidence shows that Panas purchased an airline ticket to Kansas City on November 2. He and Rhine flew together to Kansas City on November 3. They exited the plane together and Panas was observed carrying a bag of sourdough bread from which he later extracted the LSD. Panas hailed a cab while Rhine called Vanderhoof to inform him that they had arrived. At the hotel, Panas registered for a room for both of them. During the meeting with Vanderhoof and Bickers, Panas engaged in extensive discussions with them pertaining to the production, use, packaging, sale and price of LSD. He stated that he had two chemists working continuously for him, that he had additional sources of LSD, and that he sold for two other persons. He revealed his intention to "flood the east coast" with LSD. They discussed the possibility of future transactions, and Panas told Vanderhoof that they would need to alternate traveling because "the time that we have to take from the scene hurts me." He also stated that he could not leave "unless I plan a week ahead of time." After seeing that Bickers had the $42,000 purchase price, Panas left the room and returned with the bag of sourdough bread. He opened it, removed the bread, pulled out a small plug and extracted a bottle later identified as containing 11.7 grams of LSD. He then closed the curtains because he said LSD was "awful sensitive to light." He took the money from Bickers and stuffed it in his boots.

All of the foregoing reveals that Panas was extensively involved, and indeed orchestrated, the sale of approximately 265,-200 "hits" of LSD. It shows him to be the large supplier that Vanderhoof was attempting to flush out in his dealings with Rhine. This case is thus readily distinguishable from those where independent evidence revealed only that the defendant was merely present or associated with a person engaged in an illegal act. *See United States v. Harshaw*, 705 F.2d 317 (8th Cir.1983); *United States v. Holder*, 560 F.2d 953 (8th Cir.1977); *United States v. Frol*, 518 F.2d 1134 (8th Cir.1975); *United States v. Weaver*, 594 F.2d 1272 (9th Cir. 1979); *United States v. Stroupe*, 538 F.2d

1063 (4th Cir.1976). That such involvement in the substantive offense indicates the existence of a conspiracy is supported by past decisions. In *United States v. Baykowski*, 615 F.2d 767 (8th Cir.1980), hearsay statements made six days following the defendant's arrest were admissible principally on the independent evidence that the defendant was arrested with a key to a van in which stolen goods were recovered. In *United States v. Dockins*, 659 F.2d 15 (4th Cir.1981), hearsay statements made seven days prior to the defendant's arrest were admissible because, on the day of a drug transaction, he met with coconspirators, followed them in his car to a motel where the sale was to occur, and was seen in the motel lobby. *See also United States v. Haynes*, 560 F.2d 913 (8th Cir.), *cert. denied*, 434 U.S. 974, 98 S.Ct. 531, 54 L.Ed.2d 466 (1977) (per curiam). As we stated in *Harshaw*, 705 F.2d at 321: "In ... cases that found a conspiracy there was proof beyond mere presence at a series of meetings before the drug sale. Often the additional proof is that the defendant was arrested with marked money or drugs."

The above evidence obviously relates to a period several days after the first call on October 26. However, the indictment charged Panas with conspiracy "[o]n or about October 26, 1982, and continuing until on or about November 3, 1982 ...." We believe that the independent evidence outlined above makes it more likely than not that a conspiracy existed, at the very least, as of October 31: this was only two days before Panas purchased the ticket to Kansas City and three days before the actual sale.[3] The fact that this independent evidence arose two or three days after the hearsay statements does not prevent it

from establishing retroactively the existence of the conspiracy:

> The fact that some of th[e] evidence postdated the statements in question is of no consequence, so long as its natural tendency, when introduced, was to show the concert of action to have been existing at the time of the statement.

*United States v. Everidge*, 488 F.2d 1, 3 (9th Cir.1973). We conclude that the "natural tendency" of Panas' purchase of the airline ticket on November 2 and his actions and statements during the November 3 hotel transaction make it more likely than not that a conspiracy existed as of October 31. The district court was not clearly erroneous in admitting into evidence Rhine's statements on that date.

## II.

Panas next contends that, even if Rhine's statements were admissible under the coconspirator exception to the hearsay rule, their admission violated his rights under the confrontation clause of the sixth amendment.[4] He claims that under the Supreme Court's decision in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), hearsay statements run afoul of the confrontation clause unless the declarant is unavailable to testify and the statements are reliable. Panas asserts that Rhine was available to testify at his trial, and consequently that his statements should not have been admitted.

This claim is unpersuasive. While the confrontation clause and the hearsay exceptions are not co-extensive in every case, *United States v. Nelson*, 603 F.2d 42, 46 (8th Cir.1979), evidence properly admitted under the coconspirator exception does not, absent unusual circumstances, vi-

---

**3.** Panas' statement that he needs a week's notice to leave California lends color to the claim that a conspiracy existed as of October 26. We need not, however, conclusively determine whether the independent evidence established a conspiracy as of that date. The October 26 and 28 calls only referred generally to other persons that would be accompanying Rhine to Kansas City. Even if the independent evidence failed to establish a conspiracy as of those dates, the admission of those calls into evidence was harmless

error. The October 31 call, clearly the most incriminating insofar as Rhine referred to "Jimmy" and his Mercedes, along with the events surrounding the hotel transaction, provide sufficient evidence to support Panas' conspiracy conviction.

**4.** "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

olate the confrontation clause. *United States v. Bentley,* 706 F.2d 1498, 1507 n. 7 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 107, 78 L.Ed.2d 110 (1983); *United States v. Kiefer,* 694 F.2d 1109, 1113 (8th Cir.1982); *United States v. Singer,* 660 F.2d 1295, 1307 (8th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982); *Nelson,* 603 F.2d at 46; *Haynes,* 560 F.2d at 916. In determining whether such unusual circumstances are present, the "focus of our concern must be whether indicia of reliability are present and whether the trier of fact was afforded a satisfactory basis for evaluating the truth of the prior statement." *Nelson,* 603 F.2d at 47. Each case must be examined in light of its particular circumstances. *United States v. Scholle,* 553 F.2d 1109, 1119 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

■ No unusual circumstances are presented here which indicate that Rhine's statements violated Panas' sixth amendment rights. Bickers and Vanderhoof testified as to the substance of the four phone calls and were subject to extensive cross-examination. Two of the conversations, including the October 31 call that specifically referred to "Jimmy," were taped and played for the jury. Panas failed to show that Rhine had a motive for lying or suffered from lapses in memory, perception or expression. *Kiefer,* 694 F.2d at 1113. We find no evidence restricting the jury's ability to assess the reliability of Rhine's statements. Panas' sixth amendment rights were not compromised.

### III.

Panas next argues that the government failed to comply with a discovery order issued pursuant to Fed.R.Crim.P. 16(a)(1)(A). He claims that the hotel tape, the copy of the airline ticket, and his post-arrest statement that he had purchased his airline ticket under the alias "R. Sharp" were improperly withheld prior to trial. He asserts that the district court should have suppressed the evidence at trial.

■ In regard to the hotel tape, we note that FBI Photographer Johnson taped the conversation without approval from his superiors and thus in violation of internal FBI policy. The United States Attorney stated to the district court that he was unaware of the tape's existence until immediately prior to trial. Casteel, Triplett and Bickers all testified that they did not know that such a recording was made. We need not determine, however, whether, under these circumstances, the exercise of "due diligence" as required by Rule 16(a)(1)(A) would have uncovered the tape, for it is clear that admitting the tape into evidence was not "prejudicial to the substantial rights of the defendant." *United States v. Pelton,* 578 F.2d 701, 707 (8th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978). The United States Attorney made a copy of the tape available to Panas immediately upon learning that it existed. The district court granted Panas a six-week continuance to consider the evidence. Panas also was aware that Bickers and Vanderhoof would be testifying as to the events in the hotel room, and therefore the tape "did not in any respect inhibit or prejudice [Panas'] ability to marshal exculpatory facts at the pretrial stage." *United States v. Taylor,* 542 F.2d 1023, 1025 (8th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) (per curiam). Under these circumstances, we conclude that the district court did not abuse its discretion in admitting the tape into evidence.

■ We also conclude that the copy of the airline ticket was not improperly withheld from discovery. The United States Attorney asserts that the government maintains an open file policy and that the ticket was placed therein. Panas' counsel admitted that he had not checked the file for almost six months prior to trial. Moreover, he was provided with an exhibit list ten days before trial which listed the copy in question. Under these circumstances, the district court did not abuse its discretion in permitting the copy to be introduced into evidence. *See United States v. Olson,* 576 F.2d 1267, 1270 (8th Cir.), *cert. denied,*

439 U.S. 896, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978).

■ Panas' third claim is that the government withheld its intent to use the statement elicited from him by FBI Agent Hicks following his arrest whereby he admitted to using the alias "R. Sharp" to purchase his airline ticket. A review of the record, however, reveals that Hicks offered the statement during cross-examination; no mention was made of it during direct testimony. The statement therefore does not fall within the literal language of Rule 16(a)(1)(A), which provides only for the discovery of oral statements that "the government intends to offer in evidence at the trial...." We find no abuse of discretion in the district court's decision to admit the statement into evidence.

## IV.

Panas next asserts that the district court erred in denying his motion for a mistrial raised when the United States Attorney brought out on direct examination that Vanderhoof was a participant in the federal Witness Protection Program. He argues that he was prejudiced by this testimony because it created in the juror's minds the impression that Panas had threatened Vanderhoof with retribution for his role in his arrest and that Vanderhoof subsequently sought refuge in the Program.

■ The district court is given broad discretion in determining whether a defendant has been so prejudiced as to require a mistrial. *United States v. Elliott*, 674 F.2d 754, 755 (8th Cir.1982) (per curiam). We cannot say that an abuse of that discretion occurred in this case. First, testimony revealed that Vanderhoof had introduced Bickers to several drug dealers, that he had been assisting in multiple investigations, and that his efforts had resulted in the indictment of twelve to fifteen such persons. This evidence undercuts any claim that the jury viewed Vanderhoof's participation in the Witness Protection Program as resulting solely from his efforts in the Panas investigation. Second, the United States Attorney stated that he elicited

this information only to explain why Vanderhoof's name, address and occupation could not be revealed, as that information was confidential as a result of his participation in the Program. This information is typically furnished to the jury and some natural curiosity can be expected if it is not provided. This is particularly true when a government informant, formerly involved in drug activities, is placed on the stand. Finally, Panas' pretrial filings included a demand for disclosure of all forms of benefit provided Vanderhoof, including protection. It was therefore logical to bring this information out on direct examination and preempt expected cross-examination on this issue. The district court did not err in denying Panas' motion for a mistrial.

## V.

Panas next contends that he was denied a fair trial when the district court issued a Protective Order preventing the discovery of technical data of the T–4 transmitting device worn by Bickers during the hotel transaction. The FBI resisted disclosure because the T–4 device is used in both criminal investigations and counterintelligence efforts and it was feared that disclosure would jeopardize national security and the safety of undercover agents.

■ Panas reasons that implicit in the district court's granting of the Protective Order is a finding that the T–4 technical data is classified information. He argues that under section 6(e)(2) of the Classified Information Procedures Act, Pub.L. 96–456, 94 Stat. 2025 (codified at 18 U.S.C.App. §§ 1–16 (1982)), withholding classified information from discovery entitles a defendant to a dismissal of the indictment or specific counts therein or suppression of evidence obtained through use of the classified information. This claim is without merit. The Act applies only to "classified information," defined as information "determined by the United States government pursuant to Executive order, statute, or regulation, to require protection against unauthorized disclosure...." 18 U.S.C.

App. § 1(a). The district court specifically determined that the information was not classified,[5] and no "Executive order, statute, or regulation" to the contrary has been cited. The Act does not apply.[6] We therefore review the district court's granting of the Protective Order under Fed.R.Crim.P. 16(d)(1). Decisions relating to discovery, as we have indicated, will be reversed only upon a showing of "prejudice to the substantial rights of the defendant." *Pelton*, 578 F.2d at 707. Agents testified as to the range, clarity and reception of the T–4 transmission and were subject to cross-examination. Vanderhoof and Bickers testified on the basis of their presence in the hotel room and not on the T–4's transmission. Given these factors, we do not believe that the district court abused its discretion in granting the Protective Order.

## VI.

■ Panas next contends that the hotel tape should not have been admitted into evidence because the T–4 device was used without prior approval of the FBI's general counsel. He claims that two federal acts require such authorization whenever intelligence-gathering agencies provide law enforcement authorities with specialized equipment or expert personnel.

Both acts cited by appellant are inapplicable to the present case. The Foreign Intelligence Surveillance Act, Pub.L. 95–511, 92 Stat. 1783 (codified at 50 U.S.C. §§ 1801–1811 (Supp. V 1981)), establishes a procedure under which the Attorney General can obtain a judicial order authorizing electronic surveillance in the United States to acquire information for foreign intelligence purposes. This case involves a domestic criminal investigation. Therefore, the strictures of FISA are inapplicable. *Cf. United States v. Belfield*, 692 F.2d 141, 143 (D.C.Cir.1982) (persons "inci-

dentally overheard" during electronic surveillance authorized under FISA are "aggrieved" within the meaning of statute and could challenge ex parte determination that fruits of the surveillance were admissible). Also inapplicable to the present case is the National Security Act, Pub.L. 85–599, 72 Stat. 514 (codified as amended at 50 U.S.C. §§ 401–426 (1976 & Supp. V 1981)). Again, the thrust of this Act is to establish "integrated policies and procedures for the departments, agencies, and functions of the government relating to the national security; ..." *Id.* at § 401. Consequently, the authorization requirements contained in section 2.6(c) of Exec. Order No. 12333, 3 C.F.R. 200 (1982), *reprinted in* 50 U.S.C. at 840–46 (Supp. V 1981), issued pursuant to the National Security Act, are inapplicable to this case.

## VII.

Panas next asserts that the government failed to lay a proper foundation for either the telephone tapes or the hotel tape under the test established in *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir.1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). Specifically, he argues that none of the taped evidence was shown to be "authentic and correct," and that the hotel tape was not shown to be free from "changes, additions or deletions" or properly "preserved." *Id.*

■ We conclude that all the taped evidence was properly admitted. Vanderhoof and Bickers testified that the phone tapes and the hotel tape were fair and accurate. Agent Casteel, who monitored the hotel conversation, and Photographer Johnson, who recorded it, also testified that the hotel tape was fair and accurate. This testimony satisfies the requirement that taped evidence be authentic and correct. *Id.* at 104–05.

---

**5.** The district court determined that the public interest in keeping the information secret and the high probative value of the testimony and tape derived from the T–4 transmission weighed in favor of granting the Order.

**6.** We also note that, even if the T–4 data qualified as "classified information," the granting of the Protective Order did not necessarily entitle Panas to the relief he requests. Section 6(e)(2) of the Act provides that the district court may "order such other action ... as [it] determines is appropriate." 18 U.S.C.App. § 6(e)(2).

■ Panas' additional objections to the hotel tape are based on the fact that it remained in Photographer Johnson's camera bag for almost five months after it was made. We note, however, that the district court is entitled to examine all of the "foundational proof ... [and] assume that ... public officials having custody of the [evidence] properly discharged their duties and did not tamper with [it]." *United States v. Weeks*, 645 F.2d 658, 660 (8th Cir.1981); *United States v. McCowan*, 706 F.2d 863, 865 (8th Cir.1983) (per curiam). In addition to the above testimony concerning the hotel tapes' authenticity, Photographer Johnson testified that he listened to parts of it and that no additions or deletions had been made. On this basis, we cannot conclude that the district court abused its discretion in admitting the tape into evidence.

VIII.

Panas raises numerous other claims of error. We believe, however, that extended discussion of them is unwarranted and that the following precedents adequately address his contentions.

■ The airline ticket introduced in evidence was a duplicate and therefore properly admissible under Fed.R.Evid. 1003. *United States v. Gerhart*, 538 F.2d 807, 810 n. 4 (8th Cir.1976). The use of a transcript of the hotel transaction to assist the jury in identifying the speakers in the hotel tape was not improper. *United States v. Gordon*, 688 F.2d 42, 44 (8th Cir.1982). The district court did not abuse its discretion in refusing to admit into evidence an address book belonging to Rhine. *United States v. Briscoe*, 574 F.2d 406, 408 (8th Cir.), *cert. denied*, 439 U.S. 858, 99 S.Ct. 173, 58 L.Ed.2d 165 (1978) (per curiam). The imposition of consecutive sentences for the conspiracy and substantive convictions did not violate the fifth amendment protection against double jeopardy, *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), or the eighth amendment prohibition of cruel and unusual punishment, *United States v.*

*Anderson*, 654 F.2d 1264, 1271 (8th Cir.), *cert. denied*, 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981). We have considered the remaining allegations of error incorporated by reference in Panas' brief to the record below and find them to be without merit.

We affirm the convictions.