Debbie WILLIAMS and Linda Stanley,
Plaintiffs/Appellees/Cross-Appellants,

v.

William R. BUTLER, Defendant,

v.

CITY OF LITTLE ROCK, ARKANSAS,
Third-Party Defendant
Appellant/Cross-Appellee.

Nos. 83–2534, 83–2641.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1984.

Decided Oct. 15, 1984.

Rehearing En Banc Granted
Dec. 5, 1984.

McMillian, Circuit Judge, dissented with opinion.

Hugh Brown, Little Rock, Ark., for third-party defendant appellant/cross-appellee.

Philip E. Kaplan, Little Rock, Ark., for plaintiffs/appellees/cross-appellants.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

The defendant, the City of Little Rock (City), appeals from a jury verdict in favor of the prevailing plaintiff, Debbie Williams, awarding her compensatory damages under 42 U.S.C. § 1983 (1982), for a violation of her First Amendment rights by defendant Butler, a municipal judge. We affirm, but remand for a consideration by the district court of the supplemental motion for costs and attorneys' fees submitted by the plaintiffs.

## I. Facts

Butler was a duly elected municipal judge for the traffic court of the City of Little Rock. The plaintiffs in this action, Debbie Williams and Linda Stanley, were hired by Butler as clerks for his court. All three parties were employees of the City. Both of the plaintiffs, at different times, saw Butler deliberately destroy traffic tickets. Williams disclosed this event to the police. After Butler became aware that Williams had made a statement to the police, he fired her. Stanley was subpoenaed before a grand jury which was investigating possible corruption in the municipal traffic court, and she disclosed that she had seen Butler destroy traffic tickets. Stanley made two other appearances before the grand jury. Allegedly, after these appearances, Stanley was harassed by her co-workers to such an extent that she felt compelled to resign.

Both plaintiffs filed § 1983 [1] actions against Butler in his official capacity.[2] Butler brought a third party complaint against the city, seeking judgment against the City for any sums adjudged against him. The jury returned a verdict in favor of Williams, awarding her $40,000.00 in compensatory damages and $60,000.00 in punitive damages. The jury returned a verdict in favor of Butler on Stanley's § 1983 claim, and the court found in favor of Butler on his third party complaint against the City. The district court awarded Williams attorney fees, but did so only after reducing the award by 25% to account for Stanley's complete failure to prevail on her claim. On the basis of *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the district court set aside the punitive damage award the jury had returned for Williams. The City is appealing the district court's finding in favor of Butler on his third party complaint, and Williams is appealing the dismissal of the punitive damage award and the reduction in the requested amount of attorney fees.

## II. Discussion

### A. The City's liability.

The City argues that it is not liable for the unconstitutional acts of its employee, Butler. It is not disputed that, by firing Williams, Butler violated Williams' First Amendment rights. Rather, the City argues that Butler's action was not taken pursuant to City policy, nor was Butler a city "official" for purposes of § 1983. We

---

**1.** 42 U.S.C. § 1983 (1982) provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State .... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**2.** Suits brought against individual officers in their official capacities are, in effect, suits against the City. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *see also Hutto v. Finney*, 437 U.S. 678, 700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978).

hold that, under our reading of *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the City is liable for Butler's unconstitutional act.

In *Monell*, the Supreme Court reversed, in part, its earlier decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and held that local governments are not "wholly immune from suit under § 1983." *Monell*, 436 U.S. at 663, 98 S.Ct. at 2021. The Court held as follows:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person" by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Id.* at 690–91, 98 S.Ct. at 2035–36. However, the Court upheld the part of *Monroe* which held that a municipality will not be liable "solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. at 2036. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037.

Thus, under *Monell*, we need to address two questions in order to determine the City's liability in this case. First, we need to determine whether Butler's act of firing Williams implemented or executed a policy statement, ordinance, regulation, or decision adopted and promulgated by the City's governing body. If not, we need to decide whether his unconstitutional act was taken *"pursuant* to governmental 'custom' even though such a custom" had not received formal approval through the City's official decisionmaking channels. *Id.* at 691, 98 S.Ct. at 2036 (emphasis added). In other words, we need to determine whether, in executing a City custom, Butler inflicted an injury of constitutional dimensions. *See id.* at 694, 98 S.Ct. at 2037.

As a threshold matter, we note that we must view the evidence in the light most favorable to Williams, the party for whom the jury returned its verdict. *Trace X Chem. Inc. v. Canadian Indus. Ltd.*, 738 F.2d 261 at 265 (8th Cir.1984). At trial, Williams did not introduce any evidence of a formal policy statement, ordinance, regulation, or decision adopted and promulgated by the City's governing body. Thus, it is clear that Butler did not act pursuant to any of those modes of authority when he fired Williams.

Williams was the only party who introduced evidence regarding whether Butler acted pursuant to governmental custom when he fired Williams. Butler had been elected as a municipal court judge in 1969. He has served in that capacity for fifteen years. In 1969, according to his own testimony, Butler went to see the City's personnel director regarding how he was to go about getting a staff. The personnel director told him that traditionally the courts had been responsible for hiring and firing their own employees.

The district court found specifically that even though Butler's employees were processed through the City personnel office when they were hired, paid by the City, given City parking places, and worked in

City buildings—Butler hired his own employees, and controlled and supervised their work. In other words, Butler was making employment decisions for the City. The district court also found that the City personnel office had given Butler authority to make employment decisions when he had assumed his office. There was no evidence to the contrary. Thus, we think it is clear that the City, by custom and practice for at least fifteen years, had established a policy of giving municipal judges *carte blanche* authority to make their own personnel decisions. It equally is clear that Butler acted pursuant to this policy when he fired Williams.

The determinative issue in this case is whether Butler's unconstitutional decision and act were sufficient to render the City liable under § 1983. In other words, we must determine whether Butler's unconstitutional act was within the meaning of the language used by the Supreme Court when it wrote: "... it is when *execution* of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037 (emphasis added). This precise issue is a difficult

one, and appears to be a novel question in this circuit. The Fifth Circuit appears to have been the first circuit to address this question squarely and, indeed, it paved a path which several other circuits have chosen to follow.

In *Familias Unidas v. Briscoe,* 619 F.2d 391 (5th Cir.1980), the Fifth Circuit considered the liability of a state and a school board for a county judge's enforcement of an unconstitutional state statute. Because the county judge drew his authority from the state, only the school board could be held liable for the judge's actions. *Id.* at 404. In the process of reaching this conclusion, the court considered under what circumstances a county official's actions could be said to represent "official policy" for purposes of liability under § 1983. The court concluded that, at least in the areas in which a local governmental official, alone, is the "final authority or ultimate repository of ... power," that official's "conduct and decisions must necessarily be considered those of one 'whose edicts or acts may fairly be said to represent official policy'" for purposes of § 1983.[3] *Id.* The Second,[1] Third,[5] Fourth,[6] Ninth,[7] and Eleventh[8] Circuits have followed the lead of

**3.** The Fifth Circuit has followed this holding in a variety of circumstances. *See, e.g., Hart v. Walker,* 720 F.2d 1436, 1445–46 (5th Cir.1983) (county would be liable for a county supervisor's acts if supervisor was the final authority on the issue—remanded for a factual determination of final authority); *Bowen v. Watkins,* 669 F.2d 979, 989–90 (5th Cir.1982) (notwithstanding an appeals process the plaintiff could have pursued, the city would be liable for a police chief's unconstitutional act if as a practical matter the chief was the final authority on the personnel determination in issue); *Schneider v. Atlanta,* 628 F.2d 915, 920 (5th Cir.1980) (if director of the bureau of corrections had authority to make the final decision, the city would be liable for the director's unconstitutional act).

**4.** *Rookard v. Health & Hosps. Corp.,* 710 F.2d 41, 45 (2d Cir.1983) (court held the city liable for the unconstitutional discharge of employee by supervisors who had final authority on personnel decisions for the city's health and hospitals corporation).

**5.** *Black v. Stephens,* 662 F.2d 181, 191 (3d Cir. 1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) (court held the city liable

for policy promulgated by police chief, which led to the filing of false charges by police officer against a citizen complainant).

**6.** *Wellington v. Daniels,* 717 F.2d 932, 936, 937, 937 n. 6 (4th Cir.1983) (court held that, because he was the final authority on the subject, police chief's choice and implementation of practices and procedures reflected government "policy," but evidence was insufficient to establish that chief had encouraged a policy of police brutality).

**7.** *McKinley v. Eloy,* 705 F.2d 1110, 1116–17 (9th Cir.1983) (court held city liable for unconstitutional discharge of a police officer by city manager who had final authority on personnel decisions).

**8.** *Wilson v. Taylor,* 733 F.2d 1539, 1545–47 (11th Cir.1984) (notwithstanding an appeals process plaintiff could have pursued, city was liable for police chief's unconstitutional discharge of police officer); *Berdin v. Duggan,* 701 F.2d 909, 914 (11th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983) (city ordinance delegated final authority over city personnel

the Fifth Circuit and adopted this legal position. However, the Fifth Circuit recently reversed its position, at least as applied to non-personnel situations or third parties. In *Bennett v. Slidell*, 728 F.2d 762 (5th Cir.1984) (*en banc*), the court held that for purposes of liability under § 1983, the local governing body itself must have acted unconstitutionally, or must have been directly responsible for the formal policy or custom pursuant to which the unconstitutional act was taken. *Id.* at 767. Further, unless a local governing body has expressly or impliedly appointed an official to act in its place, that body cannot be held responsible for the acts of that official. *Id.* at 769. Thus, even though, in *Bennett*, the acts taken by the city officials may have been unconstitutional, and even though those authorities were final authorities on the decisions in question, the city was not liable for those acts. *See id.* at 770.

In a dissenting opinion to *Bennett*, Judge Politz offered the following reflections on the majority's opinion:

> In essence, the majority holds that any action by an appointed official that is inconsistent with the city's written ordinance is an aberrant act attributable only to that official and, therefore, that such action can never constitute official policy within the meaning of *Monell*. This restrictive interpretation effectively negates the possibility that municipal liability will ever be imposed for the unconstitutional actions of an appointed official. Indeed, under the contours defined by the majority, the instances in which an edict or act of any person not a "lawmaker" may "fairly be said to represent official policy" will seldom arise. That result is totally at odds with *Monell's* mandate that municipalities be subjected to § 1983 liability for more than the mere written words of their ordinances.

*Id.* at 771 (Politz, J., dissenting). Although we might be inclined to agree with Judge Politz' reasoning, we need make no decision on the validity of *Bennett*, as that case applied to an apparent aberrant act by a city official against a third party. The case at bar deals with a City personnel decision made by a City official. However, in *Monell*, it is clear that the Supreme Court was concerned with more than the policies, including customs with the force of policy, promulgated formally by the rulemaking body of a local government, and concerned with more than the acts taken by a local governing body itself. *See Monell*, 436 U.S. at 685–86 n. 45, 691 n. 56, 98 S.Ct. at 2033 n. 45, 2036 n. 56. Indeed, the culprit for whom the city could be held liable in *Monell* was not the local governing body of the city itself, but its department of social services and board of education which were making City personnel decisions in an unconstitutional manner. *Id.* at 660–61, 98 S.Ct. at 2020–21. Further, in *Monroe*, the landmark case in § 1983 jurisprudence and the case from which *Monell* draws its force, it is clear that the Court was concerned with unconstitutional acts taken by officials in spite, and in the face of constitutionally valid laws. *See generally, Monroe*, 365 U.S. at 171–80, 81 S.Ct. at 475–80.

■ In a situation where the victim of an unconstitutional employment decision and act is afforded redress by a procedure established by a local governing body, which could correct the injustice, that body can avoid liability for the unconstitutional acts of its officials—and the victims can be made whole. *See Owen v. City of Independence*, 445 U.S. 622, 652, 100 S.Ct. 1398, 1416, 63 L.Ed.2d 673 (1980). Under this circumstance a city would not be delegating away its ultimate authority for city employment decisions, nor would a city be abdicating responsibility for those deci-

---

decisions to mayor, so city was liable for mayor's unconstitutional discharge of city employee); *Williams v. Valdosta*, 689 F.2d 964, 969 (11th Cir.1982) (although there was some dispute as to whether plaintiff was demoted by city ordinance or by city manager who had final authority over city personnel decisions, city was liable for plaintiff's unconstitutional demotion under either theory); *Hearn v. Gainesville*, 688 F.2d 1328, 1334–35 (11th Cir.1982) (city not liable where final decision maker, city council, acted on false information supplied by personnel director who did not have final authority on personnel decisions). ,

sions. However, where, as here, there is no internal procedure of redress for the victim of an unconstitutional act because an official has been delegated final authority on an employment decision, the responsibility for which primarily lies with the City, a local governing body must be held responsible for the acts of its officials. *See generally,* R. Freilich & R. Carlisle, *Sword & Shield,* 435–37, 461–65 (1983) (Municipalities should expect that they will be strictly liable for adverse employment decisions, especially employee terminations).

As a practical matter, local governing bodies must delegate broad authority to their officials in order to keep their corporate bodies running smoothly. However, when, as here, officials are given final authority to make decisions and to act pursuant to a city policy or custom, or in other words to be the officials vested with the ultimate responsibility for acting on behalf of the city, a city cannot be allowed to abdicate its responsibility for those decisions. Under the dissenting opinion's interpretation of the majority opinion in *Bennett,* any acts taken by these officials—regardless of their constitutionality, regardless of whether the act was taken or decision made on behalf of the City, and regardless of whether the officials had the final authority on an issue—could not be attributable to the governing body absent facially unconstitutional laws.[9] If this were the case, § 1983 and *Monell* would be meaningless.

Nor can we agree with the portion of *Bennett* that holds that governing bodies may be held liable only for the unconstitutional acts of its officials of which it has actual knowledge, or which are so persistent that constructive knowledge can be im-

puted to the governing bodies. *Bennett,* 728 F.2d at 768. The law cannot tolerate a situation where the constitutional rights of several people must be violated before an individual victim can seek justice.

■ Accordingly we hold that: (1) if, according to a policy or custom established by a governing body, an official is delegated the authority, either directly or indirectly, to act on behalf of a governing body; and (2) if a decision made within the scope of the official's authority ends the matter, then the acts of the official may fairly be said to be those of the local governing body. Our holding is a narrow one. We are dealing here with an intentional, unconstitutional act taken for the City by a City official who was given final authority, pursuant to a custom established by the City through its personnel director, to make the decision which led to that act. We do not speculate beyond the precise factual situation in this case. We hold only that when a city official makes an ultimate employment decision on behalf of a city regarding a city employee, the city must be held responsible for the consequences of that decision. We wish to stress that we do not view the City's policy, of allowing municipal judges to make their own personnel decisions, as unconstitutional. The adoption of that policy clearly is within the province of the City's authority. What we take objection to is the unconstitutional act of a City employee who was, by City custom, the final arbiter on the matter.

■ While a city may not be held liable for the discretionary decisions of its officials, it should be held responsible for the consequences of administrative decisions made for the city by those officials.[10]

---

9. Yet the history of civil rights in this country is testimony to the reality that innocent victims often suffer discrimination at the hands of local officials who, for all practical purposes, are accountable to no one and who act in the face of constitutionally neutral laws that prohibit their conduct. Indeed, the Civil Rights Act of 1871 was passed in order to address the abuse of power by lower echelon officials. *Owen,* 445 U.S. at 650–51, 100 S.Ct. at 1415–16; *see general-*

*ly, Monroe,* 365 U.S. at 171–80, 81 S.Ct. at 475–80; *see generally Sword & Shield* at 23–28.

10. The crux of the disagreement between the majority and dissenting opinions in this case can be described as follows. The dissent believes that "the focus must always be whether the injury-inflicting *act* was a city policy or custom .... The question is not whether Butler 'customarily' hired and fired his own staff, but whether the constitutional injury-inflicting act ... was a city custom." *See infra* at 444, 444

The facts in this case establish unequivocally that, even though the City theoretically retained the primary responsibility for employment decisions, the City in fact had adopted a policy of delegating authority to the municipal judges to make certain final personnel decisions for the City. The City cannot be allowed now to escape responsibility for the consequences of an act taken pursuant to an established City policy. Butler, a municipal judge, fired Williams, a City employee, because she· exercised her First Amendment rights. Under these circumstances, we hold that the City is liable for Butler's unconstitutional act.

### B. The "final authority" issue.

At the close of Williams' case-in-chief, the City moved for a directed verdict which was denied by the trial court. The City characterizes this denial as error. The trial court went on to find that the City's personnel director had given Butler the final authority to make the personnel decisions for his court.[11] On appeal, the City argues that whether Butler was the final authority on personnel decisions in his court was a question of fact which should have been submitted to the jury. We disagree, and uphold the trial court's finding on this issue.

 We need not tarry long with the City's first point. It is clear that a directed verdict is proper only when the evidence is such that reasonable people could not differ as to what the verdict should be. *Jackson v. Prudential Ins. Co.*, 736 F.2d 450 at 453 (8th Cir.1984); *Rey v. Fredericktown,*

---

n. 1 (emphasis added). We believe, however, that when a local governing body has established a policy or custom of allowing certain of its officials to make administrative decisions—such as an employment decision—on behalf of the body, that the focus should be on the act taken pursuant to the policy, not on the policy. *See Monell,* 436 U.S. at 691, 98 S.Ct. at 2036 ("... local governments likė every other § 1983 'person' ... may be sued for constitutional deprivations visited *pursuant* to governmental custom ....") (emphasis added). When an official makes a discretionary decision, however, the appropriate focus may center around whether any given act itself is a policy. The distinction between the two decisions is a difficult one to articulate, but we are not totally without guidance.

In *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), the Supreme Court held that a county was not liable under § 1983 for the discretionary decisions made by county public defenders in the representation of clients because those decisions could not be characterized as county policy. *Id.* at 326, 102 S.Ct. at 454. Thus, in order for a local governing body to be held liable for the discretionary acts of its employees, it may be that the unconstitutional act itself must be a policy of the body, as the dissent in this case maintains. *See infra* at 444, 444 n. 1; *see also Dick v. Watonwan County,* 738 F.2d 939 at 942 (8th Cir.1984). We have no quarrel with this position.

However, in *Polk County,* the Supreme Court drew a distinction between administrative decisions made by officials on behalf of their local governing bodies, and discretionary decisions made by those officials.

In concluding that [a county public defender] did not act under color of state law in exercising her professional judgment in a criminal proceeding, we do not suggest that a public defender never acts in that role. In *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) ... we found that a public defender so acted when making hiring and firing decisions on behalf of the State. It may be ... that a public defender would also act under color of state law while performing certain administrative functions.

454 U.S. at 324–25, 102 S.Ct. at 453–54. We think the distinction between discretionary actions and administrative actions made on behalf of a local governing body is a crucial one. It is the determining factor which: supports a finding of liability in this case; distinguishes this case from the facts and holding in *Polk County;* and distinguishes this case from the facts and holding in the opinion of this court in *Watonwan County.*

11. The trial court's memorandum states as follows:

At the close of the evidence, the Court concluded that, as a matter of law ... Judge Butler acted in his "official capacity" and within the authority delegated to him by the City if he, in fact, terminated plaintiff; and that the City would be liable for any compensatory damages and equitable relief granted plaintiffs ...

....

... In this case, the undisputed facts are that plaintiffs were hired by Judge Butler, an official of the City; he controlled and supervised their work

.... The authority to make employment decisions was given to Butler by the City personnel office when Butler took office a number of years ago.

729 F.2d 1171, 1174 (8th Cir.1984); *Crues v. KFC Corp.*, 729 F.2d 1145, 1148 (8th Cir.1984). According to the City's brief, Williams and a witness for Williams both testified that they had been fired by Butler. Butler testified that, when he first took office in 1969, he had been given authority to hire and fire his staff by the city personnel director. There was *no* evidence to the contrary. Under these circumstances, the trial court was correct in denying the City's motion for a directed verdict.

 These same circumstances lead us to conclude that the trial court also was correct in finding, as a matter of law, that Butler was the final authority on personnel decisions for his court. When the evidence on an issue leaves no room for any reasonable difference of opinion as to its resolution, the district court should resolve the issue as a matter of law. *Roesch, Inc. v. Star Cooler Corp.*, 712 F.2d 1235, 1237 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1983), *quoting, Admiral Theatre Corp. v. Douglas Theatre Corp.*, 585 F.2d 877, 883 (8th Cir.1978); *see McGinn v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 736 F.2d 1254 at 1258 (8th Cir.1984).

#### C. The tape recordings.

The City's Police Department was investigating the Traffic Division of the Little Rock Municipal Court in 1981. On two occasions, April 24 and May 11 of 1981, Ms. Judy Wright visited Butler's chambers and wore a body microphone to record the conversations she had with Butler and court employees on these occasions. These conversations were received and recorded elsewhere by police officers. At trial, Williams introduced these tapes, and their accompanying transcripts, into evidence. Although the tape of the April 24th conversation, exhibit no. 2, and its accompanying transcript, exhibit no. 2a, were introduced into evidence, the tape was not played for the

jury nor was the transcript read by the jury. Thus, the City could hardly have suffered prejudice as a result of the trial court's admission of these exhibits into evidence. Accordingly, we confine our consideration to the objections the City raises regarding the tapes and transcript of the May 11th conversation, exhibits nos. 1, 1a, and 5.

The May 11th taped conversation, exhibit no. 1, was monitored by Lt. Plummer, a police officer. At trial, Plummer testified that he had listened to this tape, had read its accompanying transcript, and that he believed they fairly and accurately reflected the conversation which took place. Wright testified that the transcript of the May 11th conversation accurately reflected who the speakers had been. Apparently, she was not asked any other questions regarding the accuracy or authenticity of either exhibit.[12] Exhibit no. 5 was a copy of exhibit no. 1, and it had been electronically processed to remove or reduce background noise. This exhibit is the tape which was played for the jury. Prior to trial, the City made a motion *in limine* to exclude the tapes and transcripts from evidence. As to exhibits nos. 1, 1a, and 5, this motion was denied in its entirety subject to the condition that Williams provide a proper foundation for admitting the exhibits into evidence. On appeal, the City argues that Williams failed to provide a proper foundation for these exhibits, and thus they were admitted into evidence erroneously. We disagree.

 As a threshold matter, we note that the admissibility of evidence is primarily a determination to be made by the trial court. We will not overturn such a determination except for a clear abuse of discretion. *United States v. Jones*, 687 F.2d 1265, 1267 (8th Cir.1982), *quoting, United States v. Brown*, 482 F.2d 1226, 1228 (8th Cir.1973). In *United States v. McMillan*, 508 F.2d 101 (8th Cir.), *cert. denied,* 421

---

12. The parties' briefs give differing accounts of the extent to which Wright verified the accuracy and authenticity of the May 11 tape and transcript, and neither party included the relevant parts of her testimony in the designated record on appeal. For purposes of argument, we assume that Wright failed to fully authenticate these exhibits.

U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), we set forth the requirements for introducing tape recordings into evidence. The proponent of the tapes must establish that: (1) the recording device was capable of taking the conversation offered into evidence; (2) the operator of the device was competent to operate the device; (3) the recording is authentic and correct; (4) changes, additions, or deletions have not been made; (5) the recording has been preserved in a manner that is shown to the court; (6) the speakers are identified, and (7) the conversation elicited was made voluntarily and in good faith, without any kind of inducement. *Id.* at 104. The City attacks the exhibits on all but the first and sixth of these requirements.

■ Because the quality of the recording was poor, the City asks us to conclude that the tape recorder operator did not competently record the conversation; thus, the second *McMillan* requirement is not met. However, the fact that the tape recording successfully was *made* satisfies the competency requirement of the *McMillan* test. *United States v. McCowan,* 706 F.2d 863, 865 (8th Cir.1983).

■ Second, the City argues that Williams failed to authenticate the exhibits. According to the City, the tapes were not authenticated because Wright testified only that the transcript of the tapes accurately reflected who the speakers were. However, Plummer, the officer who monitored this recording, testified that he had listened to the tape, read the transcript, and that both accurately reflected the conversation which took place. Along with Wright's identification of the speakers, this testimony was sufficient to establish the authenticity and accuracy of the tape, *United States v. Panas,* 738 F.2d 278 at 286 (8th Cir. 1984), as well as its accompanying transcript. *See United States v. Gordon,* 688 F.2d 42, 44 (8th Cir.1982). While perhaps it would be preferable to have the person who prepared a transcript testify to its accuracy, *see United States v. Bentley,* 706 F.2d 1498, 1507 (8th Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2397, 81 L.Ed.2d

354 (1984); *McMillan,* 508 F.2d at 105, it is unnecessary where the accuracy of the transcript is not in dispute. Aside from the general allegations that the tape was inaudible, we note that the City has not pointed out any inaccuracies in the transcript which could have led to prejudice, *Bentley,* 706 F.2d at 1507–08; *Gordon,* 688 F.2d at 44, nor did the City offer its own version of the transcript at trial, a practice followed when the content of a conversation is in dispute. *United States v. Mendoza,* 574 F.2d 1373, 1378 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978), *citing United States v. Onori,* 535 F.2d 938, 948–49 (5th Cir.1976).

■ Further, we note that the trial court cautioned the jury to base their verdict upon what was heard, not what was read. In addition, the trial court did not allow the jury to rely on the transcript during its deliberations. Under these circumstances, we cannot say that the admission of the transcripts was error.

■ Third, the City argues that Williams failed to meet the fourth requirement of the *McMillan* test—that changes, deletions, or additions had not been made—because the tape had been electronically processed in order to eliminate or reduce background noise. This contention is without merit. The engineer who processed the tape testified that no part of the tape had been deleted, and that only sound interference had been removed from the tape. Having satisfied the trial court, this testimony was sufficient to justify admitting the tape, exhibit no. 5, into evidence and to let it be heard by the jury. *Gordon,* 688 F.2d at 44.

Fourth, the City argues that Williams failed to establish an acceptable chain of custody for the exhibits. At trial, there was inconsistent testimony between police officers as to who had the original tapes, when, and where the tapes were kept. However, it is undisputed that the originals were in the custody of the police at all relevant times.

Trial courts are entitled to assume that public officials who had custody of evidence properly discharged their duties and did not tamper with the evidence. *Panas*, 738 F.2d 278 at 287; *McCowan*, 706 F.2d at 865; *United States v. Weeks*, 645 F.2d 658, 660 (8th cir.1981), *citing, United States v. Malone*, 558 F.2d 435, 438 (8th Cir.1977). This assumption is operative until the defendant makes a minimum showing of "ill will, bad faith, other evil motivation, or some evidence of tampering." *Jones*, 687 F.2d at 1267, *quoting, United States v. Lane*, 591 F.2d 961, 962 (D.C.Cir.1979). Factors to be considered in a trial court's determination of the admissibility of evidence include the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood that others have tampered with it. *Weeks*, 645 F.2d at 660; *Malone*, 558 F.2d at 438, *quoting, Brown*, 482 F.2d at 1228. The City did not make any showing that the evidence had been tampered with, and the police had the evidence in their custody at all relevant times. As to *McMillan's* fifth requirement, it was not error to allow the tapes and transcript into evidence.

Fifth, the City tenders a weak argument with respect to *McMillan's* voluntariness requirement. The City reasons that Wright may have so manipulated the conversation which was taped as to vitiate the voluntariness of the statements made by Butler and his employees. However, as the City concedes, there is no evidence that the parties to the conversation were under any type of duress, nor is there any evidence that Wright induced those parties to speak with her. Wright merely offered these parties an opportunity to expose their corrupt activities. *See McCowan*, 706 F.2d at 865. The parties to the conversations obviously spoke of their own free will.

Thus, all requirements of the *McMillan* test were satisfied by Williams. However, the City argues that the tape was so inaudible that it was error to allow the tape and transcript into evidence.

The task of the trial court, in determining whether to admit tape recordings into evidence which contain inaudible portions, is to assess whether the unintelligible portions are "so substantial in view of the purpose for which the tapes are offered, as to render the recording as a whole untrustworthy."

*United States v. Bell*, 651 F.2d 1255, 1259 (8th Cir.1981), *quoting, United States v. Young*, 488 F.2d 1211, 1214 (8th Cir.1973). We have read the transcript of the tape to which the City objects. Although there are inaudible portions on the tape, they are not so substantial that they render the recording, as a whole, untrustworthy. The trial court did not abuse its discretion in admitting the tape and transcript of the May 11th conversation into evidence.

**D. Improper closing remarks.**

After trial, the City made a motion to modify the amount of the judgment because during closing argument, Williams' attorney improperly referred to the future monetary losses Williams would continue to suffer as a result of being fired. Future losses had not been pleaded as an element of damage in Williams' case. While we cannot condone an attempt to inject into the damages an element which neither has been pleaded nor proven, we note that the City failed to object to the remark.

This court has set forth the standard for reviewing an error which was not objected to at trial.

Rule 46 of the Federal Rules of Civil Procedure retains the requirement that counsel make timely objection to the court. The Supreme Court, in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 [60 S.Ct. 811, 851, 84 L.Ed. 1129] [1940], held that counsel, during closing argument, "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial." This court, in *Thompson v. Boles*, 123 F.2d 487, 495–96 (8th Cir. 1941), *cert. denied*, 315 U.S. 804 [62 S.Ct. 632, 86 L.Ed. 1204] [1942], adhered to the Supreme Court's ruling and held that ...

"[where an improper remark is made during closing argument], counsel may, and preferably should, make [the] objection, take [an] exception, or ask for remedial action at the close thereof and before the case is submitted to the jury." Only in extraordinary situations, in order to prevent a "plain miscarriage of justice," will a reviewing court reverse a judgment based upon errors not objected to at trial.

*Lange v. Schulz,* 627 F.2d 122, 127 (8th Cir.1980), *see also Fed.R.Civ.P.* 61. By failing to object to the remark during closing argument, the City waived its right to object to the error on appeal.

### E. Attorneys' fees.

Pursuant to the judgment, Williams' attorneys filed a motion for attorneys' fees in the amount of $19,250.00. The trial court reduced the amount requested for the work done by law clerks. The City argued that the award should be reduced because only one of the plaintiffs prevailed. The trial court found merit in this argument and, because it was impossible to distinguish between the time spent on the two claims, reduced the award by 25% for a final award of $13,338.30. After the original request for attorney fees had been filed, Williams' attorneys submitted a supplemental motion of costs and fees for $1,000.00, which allegedly reflected the time spent on post-trial motions. There is no indication, in the order awarding attorneys' fees, that the trial court considered this supplemental motion. On appeal, Williams objects to the court's reduction in fees and failure to consider the supplemental motion for fees. We affirm the trial court's award of attorneys' fees, but remand for a consideration of the supplemental motion submitted by Williams' attorneys.

The award of attorney fees is a matter entrusted to the sound discretion of the trial court, and we will not reverse a ruling on the award of fees unless the record clearly indicates that the court has abused its discretion. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933,

1941, 76 L.Ed.2d 40 (1983); *Bowman v. Pulaski County Special Sch. Dist.,* 723 F.2d 640, 646 (8th Cir.1983). It must be remembered that one of the plaintiffs in this case failed on her claim entirely, and that both plaintiffs were represented by the same attorneys.

In *Hensley* the Court noted that the most critical factor in determining a fee award is the level of success obtained by the prevailing party. *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. In reviewing which specific fee requests should be discounted from a total statement when a party has not prevailed on every claim, the "district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Id.* We think this statement also applies to this situation, where only one of two plaintiffs represented by the same attorneys prevails. We think the district court's award of attorneys' fees was a fair one. Accordingly, we affirm the district court's ruling on the original request for attorneys' fees. However, because there is no indication that the district court considered Williams' supplemental motion in reaching its determination, we remand to the district court for a sole consideration of that motion.

### F. The punitive damage award.

The jury awarded Williams $40,000.00 in compensatory damages and $60,000.00 in punitive damages. On the basis of *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the district court set aside the punitive damage award. Williams argues that this action was erroneous because the City failed to object to the punitive damage instruction during conference, and thus has waived the right to object to the award on appeal. *See Fed.R.Civ.P.* 51. We disagree.

The Supreme Court has held clearly that municipalities are immune from punitive

damages under § 1983. *Newport*, 453 U.S. at 271, 101 S.Ct. at 2762. The Court reached this conclusion in *Newport* even though the city had failed to object to the punitive damages instruction. *Id.* at 253, 101 S.Ct. at 2752. We recognize that since *Newport* some courts have held that a city waives the right to object to a punitive damage award on appeal if it failed to do so at trial. *See Barnett v. Housing Auth.*, 707 F.2d 1571, 1581 (11th Cir.1983); *Black*, 662 F.2d at 184 n. 1. We disagree with the positions taken by these courts. We hold that, under *Newport*, it would have been an error, as a matter of law, if the district court had failed to set aside the punitive damages award. *See Hart*, 720 F.2d at 1444.

In conclusion we affirm the judgment on the verdict, but remand for the trial court's consideration of the supplemental motion for attorneys' fees submitted by Williams.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. I believe that the majority has lost sight of the requirement that, in order to impose § 1983 liability upon a city, a *policy* or *custom* of the city must be the cause of the constitutional violation. I believe that a fair reading of *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), dictates the conclusion in the present case that Butler's act of terminating Williams cannot alone subject the city to § 1983 liability.

As the majority noted, the Supreme Court held in *Monell* that local governments can be sued directly under 42 U.S.C. § 1983 where "the action that is alleged to be unconstitutional implements or executes a governmental policy statement or custom." *Id.* at 690–91, 98 S.Ct. at 2035–36. My disagreement with the majority lies in

its interpretation of the following critical and oft-cited sentence from *Monell:* "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037. I do not read the Court's words here, as the majority apparently does, to declare that any act of a city official to whom the city gave the discretion and final say-so to take such action, automatically becomes city policy, no matter how aberrant or personally motivated such action may be.

I fully agree with the majority that city policy or custom may, under certain circumstances, be made by individual officials, but I believe that the focus must always be whether the injury-inflicting act was a city policy or custom. Thus, it is actions taken by officials pursuant to delegated *policymaking* authority, as opposed to mere decisionmaking authority, that can subject the city to § 1983 liability.

In the present case, there was no evidence that Butler was delegated authority to set city personnel policy. Nor was it alleged that termination of employees who testified before a grand jury about their supervisors' alleged misconduct was a city custom.[1] The evidence only established that Butler had discretion to hire and fire his own personal staff and that termination of Williams was the result of a personal vendetta and not the result of a decision made on behalf of the city. I conclude that under the particular facts of this case, § 1983 liability cannot be imposed on the city purely on the basis of Butler's act.

I recognize that other circuits have adopted the strict "final authority" approach which the majority follows today.[2]

1. I believe that the majority incorrectly analyzed the "custom" element of *Monell.* The question is not whether Butler "customarily" hired and fired his own staff, but whether the constitutional injury-inflicting act, i.e., firing an employee in violation of her first amendment rights, was a city custom.

2. I am somewhat troubled by the fact that the source of this reading of *Monell* appears to be a law review article rather than sound, independent judicial reasoning. More important, of course, is my belief that this theory represents a misreading of *Monell* and, in this case leads to an erroneous result.

Recently, however, as the majority notes, the Fifth Circuit has rejected this formula in *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984) (banc). The court there stressed that under *Monell*, a city's § 1983 liability "must rest on official policy, meaning the city government's policy and not the policy of an individual official." *Id.* at 769. The court went on to explain:

> The policy is that of the city, however, where it is made by an official under authority to do so given by the governing authority. Hence culpable policy is attributable to the governing body of the city where the policy is made by an official to whom the governing body had given policymaking authority . . . . [T]he delegation of policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the delegatee.

*Id.* *See also Losch v. Borough of Parkesburg*, 736 F.2d 903, 910–11 (3d Cir.1984) (borough not liable under § 1983 for police chief's unconstitutional misuse of criminal process by initiation of criminal charges against plaintiff without probable cause for reasons of personal animosity even if police chief were final authority with regard to police activities); *Thomas v. Sams*, 734 F.2d 185, 192–93 (5th Cir.1984) (city liable for mayor's causing plaintiff's arrest without probable cause to prevent plaintiff's interference with construction of sewer line because city entrusted to mayor complete policymaking authority for all aspects of completing sewer line), *reh'g denied*, 734 F.2d 185 (1984). I believe this is the correct analysis to apply and would reverse the district court's judgment against the city in the present case.